**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 11-20331-CR-SCOLA(s)**

**UNITED STATES OF AMERICA**

**vs.**

**HAFIZ MUHAMMAD SHER ALI KHAN**
**and IZHAR KHAN, et al.,**

               **Defendants.**
_____/

## GOVERNMENT'S TRIAL BRIEF

The United States of America, through undersigned counsel, submits this memorandum

for the Court's review during the trial of this case, currently set for January 2, 2012.

### Summary of Facts the Government Will Prove at Trial

After the killing of Osama Bin Laden in May 2011, the Pakistan Taliban – a designated

Foreign Terrorist Organization supported by these defendants – threatened the United States,

saying the President of Pakistan and the Pakistani Army "will be our first targets, America will

be our second target."  The next day, when asked how the Pakistan Taliban would take revenge

on America, a Taliban spokesman said, "We already have our people in America, and we are

sending more there."

This case is about individuals here in South Florida who, along with associates in

Pakistan, provided the kind of support to terrorists and their families that the Pakistani Taliban

and other militants require to continue their campaign of violence and terror.  It is the

defendants' own recorded words, along with financial records, that prove their guilt.  Those

words are the reason to this prosecution.

1

Moreover, despite the involvement of an informant for a limited period of time, the defendants'' financial transfers to Pakistan were always at their own initiative.  It is those transfers, and the defendants' plans to do so on many other occasions, which underlie these charges of conspiracy and material support.  The defendants did not participate themselves in bombings or run guns; instead, relying on Hafiz Khan's network of contacts from his days living in Pakistan, they used the telephone and the banking system to get money into the hands of terrorists and their families overseas.  *See United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) (the Holy Land prosecution) ("Although this case is related to terrorism, it does not involve charges of specific terrorist acts. Instead, it focuses on the defendants' financial support for terrorism and a terrorist ideology.").  When carried out from inside the United States, that activity is a crime.

The indictment (as superseded and amended)[1] sets forth some of the Pakistani Taliban's violence, including its murder of American soldiers and the attempted bombing of Times Square in May 2010.  Hafiz enthusiastically endorsed this violence in furtherance of establishing Sharia, which as conceived by militant groups like the Pakistani Taliban, signifies repressive, non-democratic Islamic law.  The evidence will show that, upon learning that four American soldiers were killed in Afghanistan, Hafiz declared his wish that thousands more Americans were killed, and prayed that the American Army would be destroyed.  Hafiz later prayed for Allah to kill thousands of Americans after hearing that seven American troops had died in a helicopter crash. Hafiz has also praised al-Qaeda and called for a global jihad; and in what he thought were secret

---

[1]     The current version of the Superseding Indictment is attached to DE422.

2

conversations with the informant, praised the Times Square bomber and wished he had succeeded.

When it came to the Pakistani government, Army and its sympathizers, Hafiz was particularly brutal and profane, calling at one point for a revolution and bloodshed like the takeover of Iran by Ayatollah Khomeini.  Hafiz's support for violence was not limited to violence against Pakistani officials and soldiers.  He called for physical attacks on civilian supporters of the government, and suggested that innocent casualties were an inevitable byproduct of the Pakistani Taliban mission.  Although co-defendant Izhar was more circumspect on the phone, the evidence will show that he spoke to his father frequently in person and that he assisted him anyway in sending money overseas.

The evidence will show that Hafiz and his sons collected and sent money for the Pakistani Taliban, which was then received and distributed by co-conspirators in Pakistan including co-defendants Amina Khan, Alam Zeb and Ali Rehman.  Hafiz sent his own money as well as money given by others for the Mujahideen cause.  The indictment identifies as overt acts some, but not all, of those transactions.  The money transfers continued into 2010, and continued past the official designation of the Pakistani Taliban as an FTO on September 1, 2010.  Even a single one of these transfers, or an agreement to do so, is a violation of U.S. law.

In addition to specific transfers reflected in the calls and corroborated by bank records, there are repeated instances where Hafiz discusses sending, or having sent, money to the Taliban. In one call, his son Izaz's wife Kalsoom reminded Hafiz that, when they had sent money for the Taliban, they had done so through Khan.  And in still another call, Hafiz and his son Irfan discussed when they would next send money to "Shariat people."  Hafiz instructed others about

how best to get money to the Taliban, providing advice, contacts and methods to avoid detection. In July 2010, for example, Hafiz explained to the informant – in what he thought was a private conversation – that when sending money for guns, a person cannot do so in the name of the Taliban, but instead must do so covertly.  The evidence will show that, in Pakistan's northwest frontier, weapons are widely available and can cost next to nothing; in recorded conversations Hafiz actually discusses the types of weapons available there.  These are not the harmless rants of an old man; they reflect a mindset and intent to support violence in the name of establishing Sharia in his former home.

In addition to being Imam at the Flagler Mosque in Miami, Hafiz is also in charge of a madrassa he founded when he lived in Pakistan's Swat Valley (which he did for most of his life). The madrassa was shut down by the Pakistani Army in mid-2009 when the Army launched an offensive in Swat to displace the Taliban.  Hafiz claimed in one recording that children went from his madrassa to train under the Taliban leader Fazlullah to learn to fight Americans in Afghanistan.  Again, these are his words, not the words of an informant, or the imagination of the prosecution.

The evidence will show that Hafiz maintains bank accounts in the United States and multiple accounts in Pakistan and sends money in a variety of ways, assisted by his sons and other co-conspirators.  He has stated in recordings that he uses complicated methods of sending money precisely in order to avoid detection.  Hafiz has multiple bank accounts in Pakistan, and was the linchpin of a network of trusted recipients and intermediaries.  We do not allege that all of the money sent by Hafiz to Pakistan was for militancy, but there should be no doubt that Hafiz has access to a significant amount of money and used portions of it for that illegal purpose.

4

Izhar, who is also an Imam in Broward County, was more careful than his father on the phone, in part because he saw his father regularly and spoke with him often in person. Nonetheless, he played an important role in facilitating the conspiracy. For example, the evidence will show that, in July 2009, Hafiz asked Izhar to collect money that was being donated by a local woman for the mujahideen. Izhar did so and Hafiz subsequently sent this money to Pakistan. Around the same time, Izhar sent $900 to co-defendant Amina Khan. Amina is Izhar's sister, and has been identified in multiple recordings as a Taliban supporter, and indeed from the calls we know she was the main conduit for money to go from America to a mujahideen. We have been candid about our view of Izhar's part in this scheme, but the evidence shows that Izhar nonetheless assisted his father in trying to get money overseas for that purpose. No matter why Izhar did so, out of loyalty or respect for his father or some other motivation[2], and no matter how small his role may be compared to Hafiz, his actions put him in the conspiracy and the evidence will support his conviction.

---

[2] *See* Eleventh Circuit Pattern Jury Instructions, Basic Instruction 9.1 and Special Instruction 9 ("Intent and motive must not be confused. 'Motive' is what prompts a person to act. It is why the person acts. 'Intent' refers to the state of mind with which the act is done.").

### The Charges

The Superseding Indictment, as amended (DE 422), charges Hafiz with four criminal offenses (Counts 1-4).  Izhar is named in Counts 1-3, but not Count 4.

Count 1 charges the Khans with conspiring to violate 18 U.S.C. § 2339A.  That statute makes it a criminal offense to provide material support or resources or disguise the nature, location, source, or ownership of material support or resources, knowing or intending that they be used in preparation for, or in carrying out one of various statutory violations. The statute also makes it a crime to attempt or conspire to do so.  *Id*. § 2339A(a).   In this instance, Count 1 states that Khan and Izhar conspired to provide material support knowing and intending that it be used to carry out or in preparation for a violation of 18 U.S.C. §956(a)(1), which, in turn, makes it a crime to conspire with others to murder, kidnap, or maim persons in a foreign country. Count 3 charges Hafiz and Izhar with the substantive offense of violating § 2339A; § 956 is the underlying violation.

Count 2 charges Hafiz and Izhar with conspiring to violate a different statute, 18 U.S.C. § 2339B. That statute makes it a criminal offense to provide material support or resources to a designated foreign terrorist organization ("FTO") knowing that the organization is an FTO or that it engages in terrorism or terrorist activity. The statute also makes it a crime to attempt or conspire to do so.  *Id*. § 2339B(a)(1).  Count 2 states that, starting in 2008 and continuing past the Pakistani Taliban's designation on September 1, 2010, the Khans conspired to provide material support and resources to the Pakistani Taliban, a FTO, knowing that it engages in terrorist activity.  Count 4 alleges that Hafiz committed a substantive violation of § 2339B by

6

proving money after September 1, 2010 to the Pakistani Taliban; Izhar is not named in this count.

Significantly, the conspiracy counts in this case (Counts 1 and 2) do *not* require the government to prove that any money actually went from the Khans to the Pakistani Taliban, or to trace the Khans' funds to any particular fighter or attack. The agreement is enough. This is particularly important in view of the defendants' apparent plan to argue that money they sent to Pakistan did not always ultimately wind up in the Taliban's hands, and if it did, it was given to the Taliban by third parties under duress. Likewise on Count 3 (the substantive § 2339A charge), the government does *not* have to prove that any money actually went from the Khans to the Pakistani Taliban, as long as it was sent at least "in preparation for" a violation of § 956 with the intent that it be used for that purpose. *See* Eleventh Circuit Pattern Jury Instructions; Criminal, Offense Instr. 13.1. Both substantive counts (3 and 4) also include "attempt" language, because attempting to provide material support is a crime under the plain language of both §§ 2339A and B.

Other points are also essential for understanding how the statues work:

- For purposes of Counts 1 and 3, under the plain language of § 956 (the violation underlying the § 2339A charges in these counts), it is *not* necessary for the government to prove the identity of any specifically contemplated victim of the conspiracy to murder, kidnap or maim, or the specific location outside the United States, or that any murder, kidnaping or maiming actually occurred. Moreover, it is not necessary for the government to prove that the underlying conspiracy involved murder <u>and</u> kidnaping <u>and</u> maiming; any one of those three is sufficient.

7

*See* 18 U.S.C. 956(a)(1). Finally, the government does not have to prove that this conspiracy yet existed. It is enough that the government proves beyond a reasonable doubt that the defendant provided material support or resources knowing or intending that they were to be used in preparation for a future conspiracy to murder, kidnap or maim persons overseas. *See United States v. Hassoun*, 476 F.3d 1181, 1188 (11th Cir. 2007) ("the Government need not prove all the elements of § 956, the object offense, in order to satisfy the elements of the substantive § 2339A charge. By its elements, § 2339A criminalizes material support given 'in preparation for' the object offense – clearly, the object offense need not even have been completed yet, let alone proven as an element of the material support offense. To meet its burden under § 2339A, the Government must at least prove that the defendants provided material support or resources knowing that they be used in preparation for the § 956 conspiracy.").

- While not sufficient standing alone, the family ties among the conspirators undeniably *can* reinforce the existence of the conspiracy and the defendants' knowledge of its aims. *See United States v. Granda*, 346 Fed. Appx. 524, 526-27 (11th Cir. 2009) ("given Granda's familial relationship with [the alleged conspirators], the jury could have inferred that [the lead conspirator, another relative] had disclosed the full extent of the conspiracy to him"); *United States v. Capo*, 693 F.3d 1330, 1334 (11th Cir. 1982) (upholding conspiracy conviction in drug importation case based in part on proof of "familial relationship with the person bringing in the marijuana from Jamaica"); *United States v. Williams-*

8

*Hendricks*, 805 F.2d 496, 503 (5th Cir. 1986) ("when inferences drawn from the existence of a family relationship or 'mere knowing presence' are combined with other circumstantial evidence, there may be sufficient evidence to support a conspiracy conviction").

- Because there is no statute of limitations issue in this case, there is *no* requirement that the government prove the exact start date of the charged conspiracies. *See United States v. Pease*, 240 F.3d 938, 943 (11th Cir. 2001) (upholding indictment alleging a conspiracy "[f]rom an unknown date through on or about July 21, 1998"); *United States v. Hristov*, 466 F.3d 949, 954 (11th Cir. 2006) (recognizing in dicta the sufficiency of an indictment that charged a conspiracy running from "an unknown date through September 9, 2003"). The Superseding Indictment in this case alleges that the defendants' conspiracies began on a date unknown "in or about 2008" and continued until at least in or around November 2010.

## Issues Likely to Arise During Trial

The government has already briefed, in pleadings and motions in limine, some of the issues that we anticipate will emerge at trial. In addition to those arguments, we expect the following problems will arise and will require the Court's attention:

### Significance of TTP's FTO Designation

The fact that the Pakistani Taliban was not designated as an FTO until September 1, 2010 (after the conspiracies in this case began) is not a defense for Hafiz or Izhar on the § 2339A counts because they do not require an FTO designation. But it is also not a defense to the §

9

2339B conspiracy count (Count 2) as long as the government can prove, which it will, that the conspiracy began before that date and continued after.[3]

A conspiracy to violate a law may be charged as beginning before the relevant law is enacted, as long as the conspiracy continued after the law took effect (in this case, after September 1, 2010).  There is no *ex post facto* problem in charging such a "straddle" conspiracy. *See, e.g., United States v Hersh*, 297 F.3d 1233, 1244-45 (11th Cir. 2002); *see also United States v. Crumpler*, 229 Fed. Appx. 832, 840 (11th Cir. 2007).  Izhar's counsel in particular has repeatedly mis-stated the law on this issue in pre-trial pleadings, and the Court should be aware of it.[4]  The government will prove that the defendants, knowing all along that the Pakistani Taliban engaged in terrorist activity, conspired to support that group before and after the FTO designation.  Likewise, evidence demonstrating a conspiracy's genesis, its purpose and its operation over time is admissible even though such evidence may have pre-dated the enactment of the statute criminalizing the conduct.  *See, e.g., United States v. Monaco*, 194 F.3d 381 (2nd Cir. 1999); *United States v. Couch*, 28 F.3d 711, 714-15 (7th Cir. 1994); *United States v. al-*

---

3 The designation date does matter on the substantive § 2339B count (Count 4), but that count only names Hafiz, not Izhar, and the government will provide that Hafiz sent money for the Pakistani Taliban after that date.

[4] Because no overt act at all is required by §§ 2339A or B, the government does not have to show an overt act after September 1, 2010, instead it simply must show that the conspiracy did not end.  We will seek a special verdict question to ensure the jury makes a finding on the continuation of the conspiracy after September 1, 2010.  Likewise, because the statute does not require, as an element, that the defendant knew about the actual designation – instead simply that the group engaged in "terrorist activity," 18 U.S.C. § 2339B(a)(1) – the government can easily prove that the defendants satisfied that element of the offense both before and after TTP's designation.  Finally, to be clear, the fact that Izhar did not engage in any activity personally after September 1, 2010 is immaterial because he did not withdraw, and unless he withdraws a conspirator is always liable for the reasonably foreseeable crimes of his co-conspirators.  *See, e.g., United States v. Silvestri*, 409 F.3d 1311, 1335-36 (11th Cir. 2005).  "A conspiracy is an ongoing criminal activity for which a participant remains culpable until the conspiracy ends or the participant withdraws." *United States v. Davis*, 117 F.3d 459, 462 (11th Cir. 1997).

*Arian*, 308 F. Supp 2d 1322 (M.D. Fl. 2004) (citing *Hersh* and applying these principles to § 2339B).

### Hearsay Testimony from the Defense:  Defendants' Own Statements

The defendants, their attorneys, and their witnesses should be precluded from introducing or referring, during any stage of the trial, to any of the defendant's own statements except as admitted by the government already. To the extent that these statements were made out of court and would be offered for the truth of the matter asserted, they are plainly hearsay and not subject to any of the hearsay exceptions. *See e.g.*, Fed R. Evid. 801(d)(2) (party-opponent exception to hearsay rule only applies when "[t]he statement is offered against a party and is [] the party's own statement[.]"); *see also United States v. Ramirez-Perez*, 166 F.3d 1106, 1114 (11th Cir. 1999) (noting that, "of course," a defendant's attempt to introduce his own statements to an agent "would have been subject to a hearsay objection" unless the defendant could show that the statement fit within one of the hearsay exceptions–in that case, the statement against interest exception); *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("[T]he district court properly refused to admit those statements because a witness' testimony as to her own prior out-of-court statement is generally hearsay."); *United States v. Eaton*, 485 F.2d 102, 105 (10th Cir. 1973) (A witness' "prior statements are admissible only to impeach or discredit the witness and are not competent substantive evidence of the facts to which the former statements relate.").

In addition, neither the defendants nor their attorneys should be permitted, in any stage of the trial, to refer to the fact that the defendants made out-of court statements, other than what the government has itself introduced.  *See United States v. Willis*, 759 F.2d 1486, 1501 (11th Cir. 1985) (affirming district court's refusal to permit defendant to cross-examine government

11

witnesses about his post-arrest statement which the government did not offer); *see also United*

*States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999).  To the extent that the substance of

those statements constitutes inadmissible hearsay and should not be presented to the jury, any

mention of the fact that some statement was made, standing alone, is irrelevant to the jury's

evaluation of the evidence. *See* Fed. R. Evid. 401. After all, without the statements themselves,

the jurors cannot say what the statements prove, let alone whether they believe them.  The Khans

also cannot put their out-of-court statements before the jury during cross-examination of

government witnesses, for the reasons stated above regarding third-party hearsay statements.

In *United States v. Bond*, 87 F.3d 695, 699-700 (5th Cir. 1996), the Fifth Circuit

illustrated these rules by pointedly rejecting an attempt by a defendant to introduce an audiotaped

statement he himself had made:

> The magistrate judge initially admitted into evidence a transcript of the tape Bond
> made while a fugitive, but later reversed himself and held that the transcript
> constituted inadmissible hearsay:  We agree with the magistrate's ultimate result.
> The transcript was not admissible under Fed.R.Evid. 801(d)(1)(B) [prior
> consistent statement] because Bond did not testify.  It was not admissible as an
> admission by a party-opponent because it was not offered against a party within
> the meaning of Fed.R.Evid. 801(d)(2); Bond offered the transcript to benefit
> himself.  The transcript was hearsay, fell within no hearsay exception, and the
> magistrate judge correctly excluded it from evidence.

*Id.*  The same reasoning applies here.[5]

---

[5]The prior consistent statement exception would not apply even if the Khans did testify.  It is well-settled that a witness cannot be corroborated on direct or redirect examination or rebuttal by proof of prior statements consistent with his in court testimony.  Whatever inherent probative value such consistent statements may have is felt to be insufficient when viewed in light of trial concerns. *Wright & Miller* ' 703 (citing Rule 403); see also *United States v. McCulley*, 178 F.3d 872, 876 (7th Cir. 1999) (no error is refusing to admit testifying defendant's own prior statement and observing that [i]t is, of course, improper to admit a previous statement for the mere purpose of bolstering a statement made at trial); *United States v. Acker*, 52 F.3d 509, 517 (4th Cir. 1995)  (The testimony as to Holly's out of court statement to Rozzi was admitted solely to corroborate what Holly testified to in the courtroom today. A prior consistent out of court statement of a witness is not admissible for this purpose).

There are two possible exceptions to these limits, but neither will apply here with any frequency, if at all. Defendants often try to argue that their prior statements are admissible under FRE 803(3) to show their state of mind at the time. But the Eleventh Circuit, in a crystal-clear series of decisions, has now cut back on this argument.

As it explained in *United States v. Samaniego*, 345 F.3d 1280, 1282 (11th Cir. 2003): "[T]he state of mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. . . . [T]he purpose of the exclusion from Rule 803(3) admissibility is to narrowly limit those admissible statements to declarations of condition 'I'm scared' and not belief 'I'm scared because [someone] threatened me.'" *See also United States v. Duran*, 596 F.3d 1283 (11th Cir. 2010) (affirming Judge Lenard's rulings applying *Samaniego*). *Samaniego* is a critical ruling that will be referred to repeatedly during trial, because it severely limits the defense's ability to shout "state of mind" every time they want to put their clients' hearsay before the jury. Simply put, if what the defendant really wants is to get across the "why" or the "because," the statement should be excluded.

Aside from 803(3), the Khans may try to argue that certain statements are not being offered for the truth of the matter asserted, but rather for some other purpose (*i.e.,* not for truth) that takes the statement out of the definition of hearsay. This Court should insist that they articulate the relevance of the purported purpose, however. This will prove difficult for them. To be admissible as a statement offered to show the effect on the listener rather than for the truth, for example, the statement must help establish that the listener did something, or took some specific action, *in direct response* to what was said, whether it was true or not. Izhar, for

13

example, is obviously not in a position to make that argument about conversations in which he did not even participate.  And to reiterate, what the listener did in response to the statement must be relevant – the Court must ensure that the listener's action actually matters and proves or disproves a fact relating to the charges against the Khans.

### Hearsay Testimony from the Defense:  Third Parties (FISA transcripts/FBI 302s)

We also expect the defense will try improperly to put before the jury statements by third parties – either on FISA transcripts not admitted by the government, or drawn from FBI 302 reports or other discovery materials.  Indeed, the defense has proffered several hundred transcripts containing such statements.  Although the issue may not arise until the defense case begins, it is essential the Court recognize that these statements are, with few exceptions, *not* admissible.  "[A]n accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

A defendant generally cannot introduce conversations or statements by third parties because they are hearsay.  This means that the Khans cannot admit into evidence recorded conversations involving third parties such as their co-defendants or co-conspirators in Pakistan unless those conversations were first introduced by the Government.   Courts in the Eleventh Circuit and elsewhere have reached this conclusion. *See  United States v. Gossett*, 877 F.2d 901, 906 (11th Cir. 1989) (upholding district court's refusal to admit statements made by co-defendant to a third party); *see also United States v. Arroyo*, 406 F.3d 881, 887-88 (7th Cir. 2005) (conversation between government agent and CI not admissible when offered by the defense); *United States v. Harwood*, 998 F.2d 991, 997-98 (2nd Cir. 1993) (same); *United States*

14

*v. Demosthene*, 334 F. Supp. 2d 378 (S.D.N.Y. 2004) (holding that recorded conversation between CI and defendant's wife would constitute hearsay and could not be introduced by defense), *aff'd*, 173 Fed. Appx. 899 (2nd Cir. 2006).

Importantly, there is no exception to these rules for the contents of FBI 302s. Just because an agent is on the witness stand, and his 302s contain interview statements by third parties, does not meant that it is admissible.

We see no hearsay exclusion or exception, at this stage, which would allow the Khans to put third party statements before the jury themselves (even assuming they could lay the threshold foundation required to admit those conversations). F.R.E. 801(d)(2), which excludes from the definition of hearsay out-of-court statements by a party-opponent, is inapplicable because statements by third parties, including statements by co-defendants, are not considered statements by the Government – the party-opponent of the defendant in a criminal case. *See Gossett*, 877 F.2d at 906 (holding evidence inadmissible under Rule 801(d) (2) "because the admission sought to be introduced was made by a co-defendant who is not a party opponent. The Government is the party opponent of both defendants."). Likewise, the hearsay exclusion in F.R.E. 801(d)(2)(E) for co-conspirator statements applies only to statements by a co-conspirator *of the party against whom the evidence is offered*, which in a criminal case is the Government, making the exclusion inapplicable. F.R.E. 801(d)(2)(E); *United States v. Maliszewski*, 161 F.3d 992 (6th Cir. 1998) (defendant cannot offer statements of own co-conspirator under this exception). And as discussed above, 803(3) will almost always be inapplicable, especially because the state of mind of persons other than the defendants is usually of no moment. *See Arroyo*, 406 F.3d at 888 (rejecting defendant's arguments that conversation between government agent and CI, which

15

included an exculpatory statement about the defendant by the CI, was admissible to show the agent's "state of mind" in pursuing the investigation).

The Khans may also try to put third party statements before the jury during the questioning of witnesses. They may, of course, try to impeach a witness on cross-examination with his or her own prior inconsistent statements, but they cannot use a different person's statements for that purpose. As the Eleventh Circuit explained when it rejected such a tactic in *Gossett*, "[t]he law in this Circuit is settled that impeachment by prior inconsistent statement may not be permitted where it is used as a stratagem to get before the jury otherwise inadmissible evidence." 877 F.2d at 906.

### **Hafiz Khan's Physical and Mental Condition**

The government is acutely concerned about how Hafiz's counsel will attempt to use his client's alleged physical or mental condition as an excuse to introduce impermissible evidence or elicit unwarranted sympathy from jurors. The Court has already found that Hafiz is competent to stand trial, and its assessment of what was going on with Hafiz's competency claim, *see* DE540, 542 (unsealed and sealed competency orders), should be a warning for what may occur at trial. Moreover, the evidence will show that neither Hafiz's age nor his condition has been an impediment to his support for Taliban violence. He has committed these crimes sometimes with as little as a phone, his contacts and his bank accounts. His kind of support can be conducted at any age under practically any limitation – Omar Abdul Rehman was blind and in his 60s when he helped plot the first World Trade Center bombing in 1993. So too is Ayman al Zawahiri, a man well into his 60's and the current leader of al-Qaeda. Point being, age and well-being are

16

not barriers when it comes to material support – not everyone is a fighter, someone has to support them and make it seem worthwhile for them and their families.

Aside from the general problem, we have two particular areas of concern.  First, Hafiz cannot introduce evidence of any alleged mental impairment to show that he lacked the ability to commit these offenses.  Congress has severely restricted the use of mental disease or defect evidence except where (unlike here) a valid claim of insanity has been alleged.  *See* 18 U.S.C. 17, *et seq.* (Insanity Defense Reform Act of 1984); *United States v. Cameron*, 907 F.2d 1051, 1061 ("Congress [in the Insanity Defense Reform Act ("IDRA")] chose to eliminate any form of legal excuse based upon psychological impairment that does not come within the carefully tailored definition of insanity in section 17(a)").  The Eleventh Circuit has emphasized that the use of psychiatric evidence to negate mens rea "may easily slide into wider usage that opens up the jury to theories of defenses more akin to justification."  *Cameron*, 907 F.2d at 1063 n.21 (quoting *United States v. Pohlot*, 827 F.2d at 905); *see also United States v. Westcott*, 83 F.3d at 1358.  In *United States v. Baxt*, 74 F. Supp. 2d 436, 440 (D.N.J. 1999), the district court, citing the Eleventh Circuit's opinion in *Cameron*, excluded the defendant's psychiatric evidence because "[e]xpert psychiatric testimony concerning . . . an 'inability to reflect on the ultimate consequences of one's conduct' is inadmissible absent an insanity defense."  In other words, evidence that the defendant lacked the capacity to form criminal intent is not admissible unless it is offered to support a viable insanity defense, which does not exist here.  Khan's lawyer cannot troop out medical evidence to lay out the physical and psychological conditions that purport to have diminished Khan's capacity to knowingly support violence and the Pakistani Taliban.  Congress very clearly meant to exclude this kind of presentation.

17

Even assuming that such proposed evidence has some slight probative value on Khan's mens rea, as opposed to his capacity to form mens rea, it still should be excluded or at least severely limited. The dangers associated with this kind of evidence have prompted courts to exclude it anyway under Rule 403. In *United States. v. Sabir*, 2007 WL 1373184 (S.D.N.Y. 2007), for example, a terrorism case, the district court excluded the defendant's proposed psychological evidence regarding his alleged mental impairment. The court first found that the defendant's proposed evidence, in the form of an expert, was indeed being offered to excuse his conduct. *Id.* at \*9 ("[A]lthough characterized by counsel as an "explanation," Dr. Hill's testimony is being offered merely to excuse or justify Dr. Sabir's conduct. As such, it is not proper. Indeed, the testimony proposed is exactly what the IDRA was enacted to prevent."). The court then found that even if then proposed testimony were relevant, it would be excluded under Rule 403 as misleading and confusing to the jury. *Id.* at 9-10 ("First, the proffered testimony would serve merely to distract the jury's attention from considering the evidence as it applies to the elements of the crimes charged. Instead, this evidence would suggest that the jurors should have sympathy for Dr. Sabir . . . and would implicitly encourage them to nullify by acquitting him based on something other than the question of whether the Government has proved each element of the crimes charged beyond a reasonable doubt. . . .[E]ven if [this] testimony had some probative value, it would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and its tendency to mislead the jury.") (some citations omitted); *see also United States v. Schneider*, 111 F.3d 197, 203 (1st Cir. 1997) (rejecting defense testimony that he suffered from "impaired judgment" due to depression and related medications because "showing 'impaired' judgment might help piece out a lack of deceit claim but falls well

short of sufficient proof.  At the same time, [this] testimony . . . could easily mislead the jury into thinking that such a medical condition amounts to temporary insanity or ameliorates the offense.").  These cases recognize that endeavoring to parse out objectionable components of the defendant's proof mid-trial is not an option in this area, because the risk of unfair prejudice is so high and the likelihood of confusion and delay is so great.  As this trial already promises to be lengthy, the case for exclusion here is even stronger.  There is a substantial risk that the jury will misunderstand this distinction, and take it as a sanctioned legal excuse. After all, why would a jury not think these are legitimate excuses for crime, if the Court allows them to be presented as Hafiz's defense?

Our second concern relates to Hafiz's alleged physical condition.  Some of the recordings in this case will make reference to Hafiz's age or condition during the time of the conspiracy, and the defense is certainly entitled to ask questions based upon those recordings already in evidence.  But the Court must monitor this inquiry carefully, and exclude altogether any questioning or independent defense evidence relating to Hafiz's current physical condition, or his potential punishment after conviction or its possible effect on him.  It is axiomatic that punishment is an issue for the Court to decide after conviction, and is not a proper subject for evidence or argument during trial.  *See United States v. McDonald*, 935 F.2d 1212, 1222 (11th Cir. 1991); *United States v. Amir*, 2011 WL 3862013 (N.D. Ohio 2011); Eleventh Circuit Pattern Jury Instructions:  Criminal, Basic Instr. 101.  Accordingly, topics such as Hafiz's present physical condition, conditions of confinement at FDC and life expectancy, may not be discussed at trial.

Allowing the defense to present this information would also constitute an invitation to jury nullification, which is improper.  In *United States v. Funches*, 135 F. 3d 1405 (11th Cir. 1998), the Eleventh Circuit commented on evidence that it was meant to invite nullification.  As the court put it, the defendant's real contention, given his failure to proffer facts sufficient to support a purported affirmative defense, was that "he had a due process right to present evidence the only relevance of which is to inspire a jury to exercise its power of nullification."  *Id.* at 1408. However, nullification is not a right of the jury, and the exercise of such power is a dereliction of the jury's sworn duty.  *Id.*

> A jury has no more "right" to find a "guilty" defendant "not guilty" than it has to find a "not guilty" defendant "guilty," and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*Id.* at 1409 (quoting *United States v. Washington*, 705 F. 2d 489, 494 (D.C. Cir. 1983)). "Because the jury enjoys no right to nullify criminal laws, and the defendant enjoys a right to neither a nullification instruction nor a nullification argument to the jury, the potential for nullification is no basis for admitting otherwise irrelevant evidence."  *Id.* at 1409.  *See also United States v. Baptista-Rodriguez*, 17 F. 3d 1354, 1363 (11th Cir. 1994).[6]

---

[6]Other courts have made the same point.  *See United States v. Bifield* 702 F.2d 342, 350 (2nd Cir. 1983) ("A defendant's right to present a full defense, including the right to testify in his own behalf, is not without limits.  In responding to the charges against him an accused must comply with the established rules of procedure and evidence, as must the prosecution, in order to insure a fair trial . . . A criminal defendant's right to present a full defense and to receive a fair trial does not entitle him to place before the jury evidence normally inadmissible."); *United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir.1975) (affirming trial court's refusal to admit evidence bearing no legal relation to the charges but which might encourage a "conscience verdict" of acquittal); *United States v. Lucero*, 895 F. Supp. 1421, 1426 (D. Kan. 1995) ("defendants are not entitled to present evidence which is irrelevant for any purpose other than to provoke the finder of fact to disregard the law.").

### Evidence of the Defendants' Lawful Conduct or "Good Acts"

The Khans' lawyers have stated (in court and to the media) that any money sent to Pakistan was for humanitarian aid or other good works, not to support terrorists and their families.   To the extent the defendants wish to dispute the government's characterization of specific transactions discussed in the recordings, they can do so through admissible evidence. What they cannot do is introduce generalized evidence about *other* transactions or good works that, they claim, were for lawful and humanitarian purposes.   Evidence regarding other transactions that are not part of the government's proof is forbidden in this Circuit, and has been precluded in terrorism prosecutions in this District and elsewhere.   Thus, in the *Padilla* case (affirmed by the Eleventh Circuit), the district court expressly instructed the jury as follows:

> As I have instructed you, the government has burden of proving the defendant's guilt beyond a reasonable doubt.  If you find that the government has proved each of the elements of a charged offense beyond a reasonable doubt, you must find the defendant guilty of that offense, *regardless of whether the defendant, on some other occasion or in some other transaction, did comply with the law.*

See P*adilla*, DE1189 at 31 (emphasis added).  This instruction was founded on clear Eleventh Circuit precedent.  *See, e.g., United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008); *United States v. Camejo,* 929 F.2d 610, 613 (11th Cir. 1992) (holding that evidence of acts of good conduct "is not admissible to negate criminal intent") (citing *Michelson v. United States*, 335 U.S. 469, 477 (1948) and *United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir. 1983) ("Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."); *see also United States v. Heidecke,* 900 F.2d 1155, 1162 (7th Cir. 1990) ("[p]roof that a defendant acted lawfully on other occasions is not necessarily proof that he acted lawfully on the occasion alleged in the indictment"); *United States v. Scarpa,* 897 F.2d 63, 70 (2nd Cir.

1990) (holding the absence of incriminating statements on tapes to be irrelevant, because "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions" (citations omitted)).

It is not uncommon for terrorists supporters to do good works at the same time they are furthering violence, whether to obscure their plans, to curry favor with the local population, or because they genuinely have twin motives.  But evidence that the Khans sent money for legitimate ends on certain occasions does not mean that they did not also support violence on other occasions, and it is that support which forms the basis for the grand jury's indictment of them.  The Khans should be precluded from offering evidence or argument about transactions that are not part of the government's proof of their liability on these charges.

### Discussion of Dismissal of Charges Against Irfan Khan

Evidence that the charges against one defendant in this case (Irfan Khan) were dismissed voluntarily without prejudice by the government is obviously irrelevant to determining the guilt of the defendants on trial now.  *See, e.g.*, Eleventh Cir. Pattern Instr. 10.3.  For that reason, Hafiz and Izhar should not be permitted to refer to that fact in any way.[7]  In *United States v. Irvin*, 787 F.2d 1506, 1516-17 (11th Cir. 1986), the Eleventh Circuit upheld the district court's ruling *in limine* that the defendant could not refer to or solicit information during direct or cross-examination regarding the fact that his co-defendants had been acquitted of the same conduct in a prior proceeding.  The Court found that the acquittals were hearsay, were irrelevant and their

---

[7] We do not know whether Irfan Khan will testify, which would present this issue in a different way.  Should the defense call Irfan, he would be subject to cross-examination on the entirety of recorded evidence against him, in addition to other matters affecting his credibility.  Irfan's name will come up in the evidence regardless, including in the recording where his father discusses with him sending money to the "Shariat people."

admission would have violated Rule 403.  The Court cited *United States v. Kerley*, 643 F.2d 299 (5th Cir. 1981), where the former Fifth Circuit held that the district court properly excluded evidence of the defendant's acquittal in state court arising out of the same incident that was the basis of the offense charged in the federal indictment.  *See also United States v. Kendrick*, 682 F.3d 974, 986 (11th Cir. 2012) (same); *United States v. De La Rosa*, 171 F.3d 215, 220 (5th Cir. 1999) (noting unanimous agreement that "evidence of prior acquittals are generally inadmissible").  Here, of course, Irfan was not acquitted, making *Irvin* apply still more.

### Ikram Khan as Co-conspirator/Police Reports

During trial, the government will be presenting recordings in which Hafiz discusses discuss another of Hafiz's sons, Ikram Khan.  In those calls, the defendants refer to Ikram with extreme caution, emphasizing that discussions relating to Ikram are not for the telephone, warning that Ikram's photos are publicly displayed in Swat, and implicitly linking Ikram to militants.  The government has produced in discovery police reports from Pakistan that identify Ikram as a member of a Pakistani Taliban-linked militia that attacked government, police and military installations in Swat on four separate occasions during 2007 and 2008.  Immigration records show that Ikram was in Pakistan for part of that time, and then again in 2009 during the height of the Army's offensive to take back Swat from the militants.  We will advise the Court before the time we seek to offer the police reports and other evidence about Ikram's activities and Taliban ties, so the defendants have a fair opportunity to litigate any objections, but proof of Ikram's activities corroborates the government's evidence about the links between the Khans and Pakistani Taliban militants.

23

### Handling of Classified Matters

Finally, this Court is aware that it has made certain rulings that were litigated on an *ex parte* basis under CIPA and are classified. The Court has also made rulings on issues relating to the legality of the FISA collection that are in part, or are based in part on, classified matter. *See* DE 278 (Order denying motions for FISA disclosures and to suppress); DE 278 (Order modifying DE 278 on one additional request for FISA disclosure); *see also* DE263/65 (government's briefing on these issues). We expect that defense counsel will not attempt to raise classified matters at trial, or make arguments which they have reason to believe were rejected or precluded in classified decisions by this Court, particularly with regard to the FISA collection. These off-limits areas include the matters raised by defense counsel in their motions to suppress the FISA recordings, such as the identity of the target(s) or target number(s) of any FISA surveillance and the date(s) any FISA coverages began and ended. When other defense questions arise that may implicate classified material, the government will object on that basis, and the Court can proceed to sustain the objection on relevance grounds, or conduct a further hearing as needed under CIPA.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:   /s/ John C. Shipley
John C. Shipley
  Assistant United States Attorney
  FL Bar No. 0069670
Sivashree Sundaram
  Assistant United States Attorney
  District Court No. A5501212
Michael Patrick Sullivan
  Senior Litigation Counsel

FL Bar No. 0134814
United States Attorney's Office
99 N.E. 4th Street, Suite 800
Miami, Florida 33132-2111
John.Shipley@usdoj.gov
Sivashree.Sundaram2@usdoj.gov
Pat.Sullivan@usdoj.gov
Bridget Behling
Trial Attorney, Counterterrorism Section,
United States Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2013, I electronically filed the foregoing with the Clerk

of the Court using CM/ECF for electronic delivery to all counsel of record.

/s/ John Shipley
Assistant United States Attorney