**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 11-20331-CR-SCOLA**

**UNITED STATES OF AMERICA**

**vs.**

**HAFIZ MUHAMMAD SHER ALI KHAN,**

             **Defendant.**

_____/

**GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO**
**DEFENDANT'S OBJECTIONS TO THE PSI**

The United States of America, through counsel, provides this Sentencing Memorandum regarding Hafiz Khan and responds to his objections to the Presentence Investigation Report ("PSI") (DE800). Khan's Guidelines objections are unpersuasive, and his Guidelines range is set properly by Probation. As for a variance, we still have not received any pleading from Khan on that issue, but whatever he may say, three facts above all compel a serious sentence:

- Khan's terrorist support was not aberrant behavior. Over a span of three years, he repeatedly and despite warnings sent money and provided other assistance to militants who he knew engaged in violence. This Court expressly described the evidence against him as "overwhelming," and the record at trial proved that Khan – despite knowing the Taliban are terrorists – supported them anyway because their goals were his.

- Khan engaged in this conduct despite his advanced age, and despite the alleged impairments that the defense now may say require leniency.

- Khan took the stand in this courtroom and lied repeatedly under oath, about matters large and small. Khan's perjury was not due to age or health. It was willful and premeditated, as we know from the recordings (*e.g.*, GX92,77) where Khan expressed his intent to lie about his Taliban ties. Khan even tried to obstruct his competency evaluation process by malingering. He does not deserve undue sympathy from this Court.

For these reasons, and the other factors discussed below, the government recommends a sentence of at least 15 years imprisonment.

**Background**

On March 4, 2013, the jury convicted Khan of all four counts in the indictment: conspiring to provide, and actually providing, material support to a conspiracy to murder, maim and kidnap persons outside the United States (Counts 1 and 3), in violation of 18 U.S.C. §2339A; and conspiring to provide, and actually providing, material support to the Pakistani Taliban, a designated foreign terrorist organization (Counts 2 and 4), in violation of 18 U.S.C. §2339B.

The jury's verdict was well-founded on evidence that Khan, between approximately 2008 and 2010, sent money and other assistance to contacts in Pakistan to further the goals of the Pakistani Taliban, whose objectives were the destruction of the lawful Pakistani government, the establishment of religious Sharia law, and the elimination of United States troops fighting against the Taliban in Afghanistan.  Khan shared each of these objectives (American soldiers defeated in Afghanistan:  GX104,107,117,122;  Sharia:  GX20,115,8,25,49,175;  destruction of Pakistani government:  GX4,6,11,29,47,54,etc.).  On the witness stand, Khan denied knowingly sending money to the Taliban, while simultaneously stating that he would have been justified in doing so. Yet prior to his testimony, Khan had admitted that fact on multiple occasions, on the phone with contacts and family, to the source, and to the FBI (phone: GX50,32,92,12,36; CHS: GX104,110,112,125,128; FBI: 302 interview report).

### The PSI and the Government's Sentencing Recommendation

The PSI sets Khan's base offense level at 33, as required by his counts of conviction. The PSI then imposes a 12-level upward adjustment due to the terrorism enhancement, USSG 3A1.4.  The enhancement also puts Khan's criminal history category at VI rather than I.  The PSI imposes a two-level upward adjustment based upon Khan's aggravating role in the offense, under USSG 3B1.1(a), as an organizer, leader, manager or supervisor of criminal activity.  Khan

also receives a two-level upward adjustment for obstruction of justice under USSG 3C1.1. These enhancements put Khan's adjusted offense level at 43 and his criminal history category at VI, which puts his advisory range at life imprisonment.

Each of Khan's four counts of conviction carries a maximum of 15 years (180 months) imprisonment. The court could impose an overall sentence of greater than 15 years by running some or all of the counts consecutively, up to a total term of 60 years (720 months) imprisonment. PSI ¶60. Although the Court is free to impose a higher sentence and has the authority to do so, the government would not oppose sentencing Khan to 15 years imprisonment on each count, running concurrently.

### Khan's Objections to the PSI

1. **Factual Objections**

Khan makes a series of objections to the Offense Conduct section at the start of the PSI. For the most part, these objections simply present competing inferences about the facts and contents of recordings that the jury, by its verdict, rejected. A defendant cannot relitigate the significance of trial evidence in the guise of PSI objections. *See United States v. Schlaen*, 300 F.3d 1313, 1318 (11th Cir. 2004) (quoting *United States v. Costales*, 5 F.3d 480, 488 (11th Cir. 1993)) ("[A] district court cannot use the post-trial sentencing process to call a jury's verdict into question."); *see also United States v. Thayer*, 204 F.3d 1352, 1356 (11th Cir. 2000) (holding that district court cannot grant relief at sentencing that "completely nullifies the effect of the jury finding" of guilt).[1] The Offense Conduct section – which is only meant to be a summary of the evidence that supports a defendant's plea or conviction – accurately identifies the key facts upon

---

1        *See also Costales*, 5 F.3d at 488 ("We are confident that the Commission did not intend the Sentencing Guidelines as an instrument for undermining confidence in a jury verdict.").

which the jury relied to convict Khan, and is both accurate and concise.

That said, we respond briefly below to Khan's specific concerns:

PSI ¶3: This paragraph does not discuss the different groups that made up the Pakistani Taliban, so it is unclear what Khan objects to. In any event, the government's expert Khuram Iqbal and others explained without contradiction that the militant group founded originally by Sufi Muhammed (TNSM) merged into the Pakistan Taliban when the Taliban formed in December 2007, prior to the start of the 2008-10 conspiracy alleged in this case. Khan was explicit throughout the conspiracy period in his support for the Taliban writ large. *See, e.g.*, GX120 (calling the Taliban the "right fix").

PSI ¶5: This is an example of Khan offering an interpretation of a phone call that the jury, by its verdict, implicitly rejected. The jury heard evidence from which it easily could have concluded that the hotel bombing referenced in the call (GX4) was indeed the Marriott, and that Khan's wish for a similar attack was not merely "exacerbation and frustration" but rather reflected his true, sustained beliefs about the Pakistani government.

PSI ¶¶6 & 8: These are more examples of Khan arguing inferences that the jury rejected, or making a justification argument that was barred as a matter of law. We note also that the government did not allege that Khan hatched a "plot or plan to exact violence against any specific person": Khan was a financier of terrorism, not a foot soldier, and as the jury instructions stated, there is no requirement for any of the charged offenses that the defendant's material support of terrorism be focused toward a specific identifiable victim (*see* DE747 at 7).

PSI ¶9: This is another instance of Khan objecting based upon an interpretation of a call that the jury implicitly rejected. But Khan is particularly mistaken here, because the

4

government's translator, Moazzam Shah, testified without contradiction that "Shariat" people as it appears in the call in question (GX32) was a reference to people engaged in fighting, and other evidence corroborated that Hafiz and his son Irfan were indeed discussing the Taliban in this call, not some pure-minded group of religious seekers that someone else hypothetically might refer to as "Sharia [not Shariat] people."  As the Court will recall, only four days after this call, Khan arranged to send money to Pakistan "for … the Mujahideen …" (GX36) and that same day sent $995 for that purpose via Western Union (GX300).

PSI ¶11:  Competing inference aside, this objection is misplaced as Khan himself finally admitted on cross-examination (after repeatedly, and despite instructions directly to him from the Court, refusing to answer) that mujahideen means Taliban.  Whatever mujahideen may signify to others, or in other contexts, there is no doubt who Khan was referring to when he said things like "[w]hat the Mujahideen need to do ... they should carry out the attacks outside ... like the one they have carried out in Pindi." (GX6 at 8).  The government's expert Khuram Iqbal and its translator witness Moazzam Shah both confirmed as well that, to Pakistanis, mujahideen refers to the militants.  There was no contrary testimony from Khan on the stand regarding the specific August 2009 transaction in which Khan sent money expressly "for the Mujahideen" (GX36), the transaction that is referenced in this paragraph of the PSI.

PSI ¶12:  This is another inference-type objection.  The government's interpretation of this call was that Kalsoom and Hafiz were discussing the Taliban, as in the militants.  That interpretation comports with the verdict.  Although Kalsoom suggested otherwise, on cross-examination it became clear that Kalsoom was both inconsistent and wholly untruthful in her testimony.  Moreover, the government's interpretation matched up with all the other evidence

that Khan repeatedly sent money to the Taliban (as in militants), and did so with the assistance and cooperation of family members such as Kalsoom.

PSI ¶15:  This is purely a competing inference objection.  If Khan were correct, he would have been found not guilty.  He was found guilty, and cannot re-argue the evidence for purposes of adopting his version of the facts in the PSI.

## 2.   Terrorism Enhancement

Khan disputes the applicability of the terrorism enhancement, but fails to cite the leading recent opinion in this Circuit about that enhancement (*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011), *cert. denied*, 133 S. Ct. 29 (2012)) (the Jose Padilla case), and makes no factual argument other than saying "the government has not made clear what conduct if any was promoted to influence or affect government conduct."

The terrorism enhancement, USSG 3A1.4(a) calls for an increase in the defendant's offense level and Criminal History category if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."   The enhancement reflects the fact that persons who support terrorism, or align themselves with terrorists, represent a unique danger to the community, and are less likely than others to be rehabilitated.  *See United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003) (noting that "terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus … terrorists *and their supporters* should be incapacitated for a longer period of time") (emphasis added).

By its terms, the enhancement applies whenever one or more offense of conviction involved or was intended to promote a "federal crime of terrorism."   USSG 3A1.4(a).  The

Guidelines define "federal crime of terrorism" by referring to 18 U.S.C. §2332b(g).  *See* USSG 3A1.4, comment (n.1).  That statute, in turn, defines "federal crime of terrorism" as any offense that "is calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct" and that violates one of a number of specified federal statutes.  18 U.S.C. §2332b(g)(5).

All of the crimes of which Khan was convicted, under §§2339A and B, are among the specified federal statutes that can give rise to the enhancement.  The only question, therefore, is whether Khan's conduct was "calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct." In the *Padilla* case, the Eleventh Circuit made clear that the "Guidelines' precise language focuses on the intended outcome of the defendants' unlawful acts—i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was."  *Jayyousi*, 657 F.3d at 1115 (citing *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004)).  In that case, the Eleventh Circuit upheld imposing the enhancement even though the defendants argued that their material support for terrorism was spurred by humanitarian concerns, and that, to the extent they funded terrorists, it was only because they were anguished by the oppression of Muslims by governments such as Russia, Somalia, Lebanon, America, etc.  The court found that, by providing money and other assistance to terrorists groups fighting against foreign governments in order to establish Sharia, the defendants by definition sought to affect, change or retaliate against government, making the enhancement proper.

There is no doubt that Khan's support of the Pakistani Taliban and mujahideen was likewise intended to affect, through violence, the activity of the Pakistani government and also to

7

retaliate against the Pakistani government.  That was the entire purpose of the Pakistani Taliban, two of whose core goals – as our expert Khuram Iqbal explained without contradiction – were displacing the lawful government of Pakistan and imposing Sharia instead of secular law.  As proved at trial, Khan shared those goals and sent money to militants for that purpose.  *See, e.g.*, GX25 at 3 ("May Allah destroy them. May Allah tear them to pieces and soak them in blood, starting from the motherfucker Zardari [Pakistan's President] up to the night watch man, whoever is against the Sharia.").  Moreover, in countless recordings, Khan stated his hatred of the Pakistani government, his wish for the destruction of that government, and his desire to impose Sharia in place of the current governing system there.  *See, e.g.*, GX54 at 13 ("So they are conducting these suicide attacks . . . this should be done at government places.").  Khan was even more explicit about his wish to retaliate against the Pakistani government for its assault on the Taliban and its perceived conduct in Swat and elsewhere.  To reiterate, under binding precedent in this Circuit, the focus must be on "the intended outcome of the defendants' unlawful acts—*i.e.*, what the activity was calculated to accomplish."  *Jayyousi*, 657 F,3d at 1115.  There can be no serious debate that the intended outcome of Khan's financial support for the Taliban was to change, or at minimum punish, the Pakistani governments and its allies.

Although this Court should make a separate factual finding in an abundance of caution, the jury's verdict already encompasses an implicit finding that Khan's purpose was to influence or retaliate against government.  The superseding indictment alleges expressly (¶15) that "[i]t was a purpose and object of the conspiracy to advance the jihad of the Pakistani Taliban against the Pakistani government and its perceived allies, including the United States, in order to displace the lawful government of Pakistan and to establish Sharia."  The indictment also alleges

(¶7) that Khan supported violent jihad, meaning "the use of physical violence, including murder, kidnapping and maiming, to bring about the downfall of governments that are perceived to oppose Sharia." This was our theory at trial, and the jury could not have returned a guilty verdict on all counts of this indictment if it had not agreed that Khan's purpose was to affect government conduct. To reach a different conclusion at sentencing would effectively contradict the verdict.

Even looking beyond the verdict to the trial record, as noted, there is overwhelming proof that the defendant's goal was to eliminate the secular Pakistani government and establish Sharia (complete with stonings and male-only rule). The jury heard from Special Agent Ferlazzo, Saifullah Khan, and our expert witness Mr. Iqbal that the Pakistani Taliban engages in violent actions, including murder, kidnapping, and maiming, targeting the Pakistani government, its allies, and foreign governments seen as aligned with the Pakistani government, such as the United States. The jury heard about the Pakistani Taliban's campaign of violence against the Pakistani state, ranging from large-scale attacks on government officials (the Marriott bombing) to attacks on police and military barracks (Mingora and Alpura in 2009) to individual killings of Pakistani soldiers and police. The jury heard from Saifullah Khan how Taliban commander Motabar Khan, the same Motabar Khan from Hafiz Khan's village, called for the death of Pakistani soldiers so he could feed them to the dogs. The jury also heard about the Pakistani Taliban's attacks on institutions of the American government, such as the CIA base in Khost, Afghanistan in 2009 and the U.S. Consulate in Peshawar in 2010, meant to drive the United States away from that region.

Khan praised this anti-government violence, endorsed it and called for more, sending money and providing support through his madrassa for that purpose. His goals were in line with

the goals of the Pakistani Taliban—violence against the Pakistani government, violence against America, removing the Pakistani government and replacing it with Sharia.  He told the source unambiguously that the Taliban was the "right fix" for Pakistan and the world.  GX120.  He wished for the Pakistani Assembly to be destroyed just as the Marriott hotel had been.  GX4.  He asked for God to grant success to the Taliban so that Sharia would be implemented, while praising a mujahid who was covertly lobbing a grenade at soldiers. GX11.  He wanted the Taliban to do an explosion, a "bang" as he called it, in Islamabad, and wanted the President of Pakistan to be tied to a cannon and its leaders to die as apostates.  GX29.  He wished for the death of "fifty thousand" uniformed American troops in Afghanistan.  GX126.  In his own words:  "May Allah utterly destroy them. The destruction …if they do not repent and do not revert to the right path … then from this motherfucker Zardari and up to a watchman … uh … however many of these motherfuckers in the *Assemblies* are involved in this…if they do not revert to the right path; they do not obey this Prophet's religion … that may Allah cut them into small portions through his Divine way. If they do not project the religion of the Prophet … and if the way of the Prophet and the Quran …they do not establish it for the people … then may Allah obliterate them from this country and may Allah destroy them."  GX47.

The examples go on and on.  There can be no serious dispute that Khan's purpose in supporting the Taliban was to remove and/or retaliate against the Pakistani government and its allies.  Accordingly, the terrorism enhancement in 3A1.4 applies.

### 3. **Role Enhancement**

Khan's objection to the 2-level enhancement for role has nothing to do with application of the Guidelines.  His argument on this issue consists of claims that he only sent money because he was asked to do so by friends and family, and that he had no control over how the funds were used.  His argument ignores the trial record and contradicts the verdict, but certainly has nothing to do with role.

Nonetheless, for the reasons stated below, a role enhancement is proper here. Section 3B.1(c) of the Guidelines provides for the enhancement of the offense level by two levels if the defendant was an organizer, leader, manager, or supervisor in the criminal activity. The commentary to 3B1.1 sets forth factors the court should consider in determining whether the enhancement applies: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.  USSG 3B1.1, comment. (n.4). All of these considerations need not be present. *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009).  Evidence showing that the defendant exerted influence or control over just one other participant is sufficient.  *See United States v. Lozano*, 490 F.3d 1317, 1323 (11th Cir. 2007) (enhancement properly applied even in a situation where the defendant lacked decision-making authority because he instructed at least one co-conspirator to engage in criminal conduct and was "intricately involved in the offense"); USSG 3B1.1, comment. (n.2). A "participant" is a person who is criminally responsible for the offense, even if not convicted. USSG §3B1.1, comment.

(n.1).  In *Mandhai*, the Eleventh Circuit determined that a court in this district properly applied a 3B1.1(c) enhancement where the defendant recruited just one other individual into a terrorist plot.  375 F.3d at 1248.  Similarly, Judge Lenard applied a role enhancement to the organizer of the Liberty City Seven group of aspiring al-Qaeda adherents.

   As the centerpiece of this Taliban funding scheme, Khan is undeniably deserving of an aggravating role enhancement.  Khan was the linchpin for this network.  He provided the money, the contacts and the know-how to make it happen.  He did not take direction from anyone; on the contrary, it was Khan who provided instructions to others about how to obtain the money and how to distribute it.

   All of the relevant factors support the enhancement.  One, Khan alone exercised decision-making authority over how they money was to get from the United States to Pakistan, and who would get it once there.  Two, Khan did not merely transfer money to Pakistan and leave it to others to decide how to spread it around; rather, he provided specific instructions.  There was no one more deeply involved in the charged material support offenses.  Three, Khan recruited accomplices to help him to do this.  He recruited individuals in South Florida – including family members such as Ikram Khan and mosque congregants such as Anwar Ansari – to provide money for the Taliban and help him send it overseas.  He recruited individuals in Pakistan to help him distribute that money.  Some of those were co-defendants, such as Alam Zeb, Amina Khan and Ali Rehman.  Others were unindicted co-conspirators, such as Noor Mohammed.  But Khan spoke to all of them and gave them directions, not the other way around.  Although Khan claimed at trial (more through counsel than witnesses) that people in Pakistan did not always follow his instructions, there are many instances where we know from the calls and the bank

12

records that his instructions were followed to the letter.   Without Khan, this United States-based funding network would not have existed.  That is an undeniable fact.

Four, although Khan did not personally claim a share of the proceeds of this scheme to fund the Taliban, he provided the money, and also provided the madrassa from which Taliban fighters would emerge, and used the madrassa as a pretext to raise funds.  Five, obviously no one played a greater role than Khan in planning or organizing these offenses.  Six, the scope of Khan's illegal activity was extensive, spanning at least three years and involving multiple transactions and multiple intended Taliban recipients.

Finally, seven, Khan exercised a significant degree of control over other participants in the scheme.  People in South Florida gave Khan money when he asked.  People in Pakistan listened to his phone calls and distributed money in accordance with his demands.  Taliban sympathizers such as Zeb and Noor Mohammed took the money that Khan wished them to receive.  A role enhancement is therefore proper.

### 4.   Obstruction Enhancement

USSG 3C1.1 provides for a two level enhancement for defendants who "willfully obstruct[ ] or impede[ ], or attempt[ ] to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." *Id.* A defendant may obstruct or impede justice by "committing, suborning, or attempting to suborn perjury." USSG 3C1.1, comment. (n. 4(b)).   Perjury, for purposes of applying this enhancement, has been defined by the United States Supreme Court as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94

(1993); *see United States v. Hubert*, 138 F.3d 912, 915 (11th Cir. 1998).  For purposes of 3C1.1, "'[m]aterial' ... means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." USSG 3C1.1, comment. (n. 6).

When applying this enhancement, "the district court [should] make specific findings as to each alleged instance of obstruction by identifying the materially false statements individually." *United States v. Arguedas*, 86 F.3d 1054, 1059 (11th Cir. 1996).  However, "a general finding that an enhancement is warranted suffices if it encompasses all of the factual predicates necessary for a perjury finding."  The district court can rely not only upon the evidence, but also upon its own impression of the defendant's credibility.  *See, e.g., United States v. Singh*, 291 F.3d 756, 763-64 (11th Cir. 2002) ("we defer to the district court's credibility finding as it had the opportunity to see Singh and to view him while he testified and found him not to be telling the complete truth").

Although not mandatory, the enhancement is imposed routinely when a defendant takes the stand to lie about his criminal conduct and ultimately is found guilty.  *See, e.g., United States v. Davis*, 2013 WL 3198493 *3 (11th Cir. June 25, 2013) (enhancement proper where defendant's "testimony was internally inconsistent, irreconcilable with her earlier admissions to [the] Agent [] and implausible"); *United States v. Ellisor*, 522 F.3d 1255 (11th Cir. 2008) (same); *United States v. Vallejo*, 297 F.3d 1154, 1168–69 (11th Cir. 2002) (enhancement proper where the defendant's statements at trial were contradicted by government witnesses).  This Court recently applied the enhancement in *Simchuk*, the Russian "B-Girls" case, and should here too.

Khan undeniably lied about the extent and nature of his intentional financial support for the Taliban, as the verdict reflects.  *See United States v. Ibrahim*, -- F.3d --, 2013 WL 3481421

14

*3 (2nd Cir. July 12, 2013) (upholding obstruction enhancement for terrorism defendant due to his perjurious testimony at trial, based upon district court's observation that "'the defendant's lies were so brazen and so abundant' that it was 'almost difficult to know where to start.'").

Although Khan at times on cross stated that funding the Taliban was justified in his mind, during his testimony he continually denied purposefully sending them money.  He persisted in that testimony despite multiple prior admissions – on the phone calls, in conversations with the CHS, and to the FBI – that he had done so.  Khan tried to excuse away each of those prior admissions, claiming that he was misunderstood, misquoted, mistranslated or (with respect to the CHS) simply playing along.  These explanations were false, and made his denials at trial even more glaring.

But Khan did not simply lie about his support for the Taliban.  During his testimony, Khan lied about a host of specific matters that were highly material to the jury's deliberations. The list is long, as the Court will recall.  The following are some examples:

- Khan lied when he told the jury that, when praising the Taliban to the CHS, he was only pretending and did not mean what he said.  This testimony was contradicted by the phone calls, which, as the government developed painstakingly on cross, demonstrated that Khan said exactly the same things in private conversations with family and friends that he did to the source.

- Khan lied when he told the jury that he did not reveal his "I'm only pretending to like the Taliban" game with the CHS to anyone in Miami because a person named Ramat Gul (ph) told him not to.  There was no corroboration of this claim, and Special Agent Ferlazzo testified that he was aware of no such person in this investigation.  Khan's inability to describe this alleged person underscores the falsity of his claim.  Khan initially said that this person spoke Pashtu not Urdu, only to shift 180 degrees to say that the man spoke Urdu not Pashtu (after being reminded on cross that the CHS doesn't speak Pashtu and thus could not possibly have collaborated with the hypothetical Mr. Gul).  Khan said that the man lived in West Palm and was transferred to Miami, only to shift gears on cross to say that he lived in Miami and

was transferred to West Palm.  Khan offered varying accounts of how many times the person was at the Flagler Mosque, ranging from all the time, to a few times, to one time a week.  Khan initially claimed that the man showed up with the CHS in tow the first time, then changed course and said the man never came with the source.  Khan alternated between saying that his conversations with this man were always when they were alone, and saying instead that there were always witnesses around.  And of course, Khan could not provide any contact information for the man.  The supposed warnings of the mystery man were critical to Khan's defense, because it was his only attempt to explain why he never told anyone about his supposed game with the source.  Khan's lies about the existence of this man were highly material because, without them, the defense had no answer to Khan's highly incriminating admissions made on the CHS recordings.

- Khan lied when he testified that he wrote a letter to a person in Pakistan (never clearly identifying who) saying that he had been lying to the CHS about being a Taliban supporter and that everyone in Pakistan should go along with that story when the CHS traveled there.  There was no corroboration for this claim, and no proof of such a letter.  Aside from the fact that the premise of the supposed letter is untrue (that Khan was lying when he praised the Taliban to the CHS), Khan could not provide any specifics about the letter, and the telephone recordings contain no mention of it whatsoever, even in the lead up to the CHS's visit to Pakistan.

- Khan lied when he testified that the CHS promised him $1 million for his madrassa. There was no corroboration for this claim, and the recorded evidence contained no mention of $1 million, but only references in May 2010 to a promise of $5000.  Agent Ferlazzo confirmed in his testimony that there is no evidence regarding any supposed $1 million offer by the CHS.

- Khan lied when he told the jury that "Amjad Khan" was not an alias meant to conceal the true identity and whereabouts of the injured Taliban fighter Abdul Jamil.  Khan claimed that he was not trying to hide Jamil's identity, but rather that he called Jamil by the name Amjad Khan to keep Jamil straight from all the other Abdul Jamils in the family.  This claim makes no sense, and there is only one Abdul Jamil related to Khan in this record.  Moreover, the calls make clear that Khan and his associates used the name Amjad Khan precisely because they knew he was wanted in his true name for being a Taliban fighter.  *See* GX 152 ("We don't discuss Amjad on the phone").  Finally, we know Khan was prepared to lie about this topic, because he had already lied in telling the FBI after his arrest that the only Amjad Khan he knew was a "laborer in Islamabad."

16

- Khan lied when asked about a critical phone call (GX39) in which he discussed funding Taliban sympathizers with co-defendant Alam Zeb.  That call contained the following exchange where Khan clarified that when he referred to the "needy," he was not talking about the poor but rather the ones doing "Sharia's work," *i.e.,* the militants:

> HK:  [ ]  Well...I would give less to the sisters, but what I meant was that if I had done this…I will think about that...if there are some needy in the area, some needy kind of people…that…anyway...this can be done by Amina as well as is not a big deal…but I was saying that…
> AZ:  There are [needy] over here.
> HK:  Huh?
> AZ:  There are over there.
> HK:  No-no.  Man!  I don't mean the needy per se!
> AZ:   Hunh?
> HK:  I mean the ones who have been pushed out of their homes, and the ones who have died…in this –
> AZ:  That is what I am saying –
> HK:  Hunh.  The ones who are doing the Sharia's work – […] for them.

GX39 at 4-5.

When asked who he was referring to in this passage, Khan, after initially refusing to answer, claimed that he was referring to the people who are getting together members of the Assembly.  But even under the most generous reading of this passage (which appears in a conversation where Khan praises the Taliban and curses the government), Khan plainly was not discussing sending assistance to the Pakistani Assembly.  After all, in other calls (GX4, etc.) Khan had already made plain his desire to see the Assembly blown up.

- Khan lied when he denied having admitting, as he did to Special Agent Ferlazzo in his post-arrest interview, that he had provided money to fighters in Pakistan.

These are only some of the specific instances that the Court may cite as a basis for upholding the enhancement.  We rely as well on the Court's (and implicitly the jury's) overall impression of Khan's lack of credibility.   Allegedly fading memory, supposed gaps in translation, and unfamiliarity with lawyer questioning do not explain or excuse what Khan did in

17

a sustained way over the course of four days on the stand, which was obvious to all: a knowing

plan to avoid telling the truth and obstruct the trial process.

This should have come as no surprise.  Khan was very clear in conversations with his

own family and with the source that he was prepared to lie to further his cause.  The Court will

recall Khan's conversation with his daughter Husna in April 2010 (GX 92).  This conversation

occurred shortly after Husna's US visa had been revoked due to her family's links to terrorism.

Khan and Husna discussed what he should say if asked about terrorism.  Khan said that he would

lie and proposed to say that he only just found out that his money was going to the Taliban:

> HK:     Hmm. This was not proper [coughs] that they ask me about the
> Taliban…if they asked me I would say, "Yes.  It is correct." I did not
> know it before but I have found out now that I have sent money to the
> Taliban … for the reason … that I used to send the money to them and
> their kids and I was helping them but I found this out that I have sent it to
> the Taliban … that they are Taliban … I have only just found out.  So now
> whatever mistake I have made, so I have made … I did not know that they
> are Taliban…now I have found out that they are Taliban…so then I would
> not sent them [money] in the future.  Are you listening? Are you listening?

GX92 at 17-18.  Husna then proposed a different lie and discussed with Khan whether their

recordings could be produced:

> HB:     No. First tell them that those people had died and so I had sent to them
> [their families].  I had sent it to them.  Now over the telephone…the
> record of these things [talks] cannot be brought forth, right?

> HK:     Why cannot it be brought forth? [] So what should we say? These things
> get recorded…so what are we saying?  They take their clues from that. . . .

*Id.* at 18.  Husna's story was exactly the story that Khan chose to tell to the FBI after his arrest

and to the jury at trial.

18

Khan later admitted his intent to lie in a recorded conversation with the source and justified his refusal to tell the truth about Taliban financing. On June 30, 2010, Khan and the source discussed a recent Taliban attack on American troops in Afghanistan:

| | |
|---|---|
| CHS: | --The Taliban people there struck really hard last night. |
| HK: | Who? |
| CHS: | The Americans in Afghanistan. |
| HK: | May God kill all of them. May God … |
| CHS: | The tall guy was telling me that in the morning. |
| HK: | Hmm. I heard that the press [ph] spreads propaganda. I think they will not show their own disgrace. |
| CHS: | He was saying that these people – these people are very much afraid of the Taliban. |
| HK: | God willing—Allah willing—Allah willing. |
| CHS: | I really liked it when you told me that Anwar [Ansari] sends money to the Taliban. |
| HK: | Um-hum. We just try to help them a little, by the grace of God. |
| CHS: | Um-hum. |
| HK: | Why should we inform these filthy people? […] |
| CHS: | [OV] These people – |
| HK: | Even if we have to lie for them, ok? |
| CHS: | Yes. |
| HK: | Then have to lie for God; definitely do it. For one's own self and for one's goal … For the ones they work for, or for those who are oppressed. You should lie to rescue the oppressed from cruelty. God will forgive you. |

GX104 at 76-77.

On top of his false testimony, Khan tried repeatedly to disrupt the trial process during cross-examination. Rather than answer questions in a straightforward manner, as he generally did for his own counsel's examination, Khan on cross simply refused to give any direct answers. No matter how many times certain questions were put to him, he would not answer, choosing instead to talk about a different subject, to feign confusion, or simply to insult prosecutors or the FBI. The Court will recall in particular that Khan was asked over and over whether, when he used the word "mujahideen" in a specific call referencing violence (GX6), he was referring to the

Taliban.  This issue was important because Khan's counsel had claimed that the word mujahideen in the abstract could refer to people engaged in non-violent activity, such as people striving for religious purity or even people fleeing Swat after the military intervention there.  The question was put simply and repeatedly, yet Khan refused to answer yes or no.  Only after the Court (twice, as we recall) admonished Khan did he ultimately admit that, indeed, mujahideen meant Taliban.  Khan's antics were so extreme that this Court day after day had to admonish Khan to answer the questions put to him, had to give Khan an unprecedented 15-minute soliloquy one afternoon to stop him from complaining inaccurately that he was not being allowed to answer questions fully, and ultimately added language to the Pattern Jury Instruction on witness credibility reminding the jury that it could take into account whether "the witness appear[ed] to understand the questions clearly and answer them directly, or was the witness evasive in answering questions." DE747 at 3.

For all of these reasons, the enhancement for obstruction is proper in this case, and in all other respects the PSI is accurate.

### Government's Arguments Under §3552

*Booker* requires the district court to consider the factors in 18 U.S.C. §3553(a) and determine a reasonable sentence. *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with training or medical care; (6) the kinds of sentences available; (7) the sentencing guideline range; (8) pertinent policy

statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to the victims. *Id.*[3]

While a court must consider all the relevant factors, it "need only acknowledge that it considered [them], and need not discuss each of these factors in either the sentencing hearing or in the sentencing order."  *United States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007).  A district court commits a clear error of judgment if it weighs the §3553(a) factors unreasonably, or after considering them arrives at a sentence that does not achieve the statutory purposes of sentencing. *See United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*).

The relevant factors in this case support a sentence of at least 15 years' imprisonment:

**1. The nature and circumstances of the offense and the history and characteristics of the defendant**

The nature and circumstances of Khan's offenses certainly support a 15-year or greater sentence.  Khan purposefully sent money to terrorist mujahideen, engaged in a murderous fight against the Pakistani government and its perceived allies.  Khan did so covertly, deceiving congregants at his mosque (such as Dr. Subhani, GX10,12) who would never have knowingly allowed him to support violence.  Although he did not preach violence or solicit donations from the pulpit, Khan undeniably used his position at the mosque to make his funding scheme happen, as he did with Dr. Subhani and in collecting money from admiring congregants such as Anwar Ansari.  The fact that Khan brought his faith, and the mosque, into this scheme warrants a stronger punishment.  Moreover, this was not a government "sting"; this was a real instance of a man sending money to people he knew were militants, because he wanted that money to be used to establish Sharia by any means necessary including force.

---

[3]        There is no issue of restitution in this case, §3553(a)(7), so that factor is not addressed below.  The rest are, in sequence.

For years Khan sent money to terrorists overseas – terrorists who targeted not only Pakistanis, but Americans and many other innocent people.  If not for this prosecution, Khan would have continued to do so, through his network of friends and family.  His criminal activity in this case was not isolated; on the contrary, it extended over the length of a multi-year conspiracy.  During that time, Khan continued to engage in unlawful conduct even when he suspected that government agents were listening to his calls, and he also attempted to thwart justice by plotting excuses and advising others how to send money to the Taliban without detection.  *See, e.g.*, GX 125 ("Therefore, I am telling you not to make obvious association with Taliban, and kick their asses as much as you want—the army—and ah—ah—those who are against Taliban—do it—and help Taliban as much as you want. … Whatever sympathizer of Taliban you see—if you like—even if he [UI] is not their—ah—a devoted person—because a devoted person is in hiding these days.").  Khan, to this day, remains unrepentant, and has never disavowed his belief that violence against the Pakistani government is warranted.

Khan did not engage in violence himself, and the amount of money that he sent which was provable at trial (a fraction of what he presumably sent) came to tens of thousands, not hundreds of thousands, of dollars.  But as Khuram Iqbal explained without contradiction, a terrorist network needs individuals like Khan to supply money and support from overseas.  Iqbal also explained, again without contradiction, that money in Pakistan, especially Swat, goes a long way, particularly when used to purchase arms in the markets on the Afghan-Pakistan border and when sent in the form of valuable U.S. dollars.  We are not contending that Khan's misconduct tops the scale of terrorism offenses.  But his sending money to militants in Pakistan helped the

Taliban put Pakistani and American lives in jeopardy and fostered violence, not peace.[4]

Khan's personal history and characteristics do not support a less than 15-year sentence. To the defense, it is this factor which they will say justifies ignoring the Guidelines and all the other factors in §3553 which compel a serious sentence.  As the defense may see it, Khan is an old, physically and mentally impaired man who, the jury's verdict notwithstanding, did not really mean to support terrorists, but instead sent money out of a love for education and humanitarian concerns.  However, over-reliance on this factor, especially in terrorism case, is a recipe for appellate reversal.

For example, in *United States v. Sattar*, 590 F.3d 93 (2nd Cir. 2010), the Second Circuit vacated the district court's substantial variance for Lynne Stewart (the lawyer who assisted the Blind Sheik, Omar Abdul Rahman, in passing his jailhouse messages to terrorist sympathizers in Egypt), due in part to her ill health—she had, for example, suffered from cancer, for which she had undergone surgery and radiation therapy, and for which there was a significant chance of recurrence.  The district court was of the view that in light of those conditions and her age, 67 years old at the time, prison would be "'particularly difficult'" for her, and that at her age, moreover, her sentence would "'represent a greater portion of her remaining life than for a younger defendant and provide increased punishment.'" *Id.* at 117.  The Second Circuit, however, found that these factors even in combination with other positive personal characteristics did not justify a variance from 360 months to 28 (similar in scale to what Khan

---

4        We do not know what arguments Khan might make to diminish the seriousness of his offenses.  In *Jayyousi*, the Eleventh Circuit held that a substantial variance could not be justified in a terrorism case on grounds that (1) the defendants did not personally kill anyone or target any specific victims, (2) their crimes did not specifically target the United States, and (3) the defendants were convicted of conspiracy charges.  657 F.3d at 1118. Those arguments would be especially inapt here, because Khan was convicted of substantive material support charges as well as conspiracy, and the group he funded (the Pakistani Taliban) certainly did target the United States, including its soldiers in Afghanistan and ordinary citizens in Times Square.

may seek here), especially in light of her perjury at trial.   As Judge Walker put it in his concurrence, "the district judge's focus on Stewart's personal qualities exceeded the bounds of reasonableness in light of the gravity of her crimes. … Whatever weight Stewart's career, age, and physical condition might reasonably warrant, these factors cannot support an unprecedentedly lenient 28–month sentence for what the district court itself termed her 'extraordinarily severe criminal conduct.'" 590 F.3d at 182.[5]

In the Blind Sheik's own case a decade earlier, the district court imposed a life sentence despite the fact that he was sightless, old and sick.  The Second Circuit affirmed the conviction and sentence. *United States v. Rahman*, 189 F.3d 188 (2nd Cir. 1998).  The Eleventh Circuit and other courts have not hesitated to impose significant sentences upon older defendants in non-terrorism cases too where the punishment fits the crime. *See United States v. Stumpner*, 174 Fed. Appx. 522, 523 (11th Cir. 2006) (upholding 292-month sentence imposed upon convicted drug dealer despite defendant's claim that he "should receive a lesser sentence because he was 74-years old and the recommended guideline range would practically impose a life sentence," because his criminal history and the seriousness of the instant offenses outweighed his elderly status and warranted a sentence within the recommended guideline range"); *United States v. Seljan*, 547 F.3d 993, 997–98 (9th Cir. 2008) (*en banc*) (87–year–old defendant sentenced to 20 years for sexually abusing children); *United States v. Battle*, 04-20159-Cr-Gold (S.D. Fl.) (elderly so-called "Cuban mafia godfather" sentenced to 20 years despite kidney failure, a heart problem, complications of hepatitis, blindness, and confinement to a wheelchair).

The Court should also consider Khan's perjury at trial.  His false testimony is not only a

---

5       On remand, Stewart received 10 years' imprisonment, despite never sending any money overseas and not calling for any violence herself.  686 F.3d 86 (2nd Cir. 2012).

consideration under the Guidelines, but is also a factor to consider separately under §3553.  *See Sattar*, 590 F.3d at 149-51 ("we think that whether Stewart lied under oath at her trial is directly relevant to whether her sentence was appropriate in light of Section 3553(a). … Any cover-up or attempt to evade responsibility by a failure to tell the truth upon oath or affirmation at her trial would compound the gravity of her crime.").

The Court can certainly take Khan's age and condition into account under §3553, but there is no indication that Khan is so impaired that he cannot be incarcerated for a term appropriate for his crimes.  In addition, Khan's physical and mental condition may not be as extreme as his counsel has suggested.  The Court will recall the findings of the BOP report regarding Khan's condition and competency issued on October 1, 2012, which concluded that Khan was exaggerating many of his symptoms in an effort to avoid trial.  The Court noted this fact in its order finding Khan competent to stand trial.  *See* DE 539, 540.  The BOP report stated that Khan was malingering to try to fail his competency-related tests, deliberately refusing to answer certain obvious questions and manipulating his responses to others. *See, e.g.,* BOP Report, Oct. 1, 2010 (copy available to Court) at 6-7.  This Court subsequently found that the BOP's assessment was correct and that Khan is "exaggerating his memory difficulty."  DE539 at 2.  Among other things, the Court observed that BOP's conclusions were "bolstered by the fact that a report from thirteen years ago rated Khan 13/28 on an Mini Mental Status Examination, and that he rated, essentially, the same score (13/30) when the same examination was recently administered by Dr. Kidwai.  Dr. Kidwai testified that it would be normal to see a three to four point decrease, each year, in this score in a typical individual suffering from dementia. The fact

that no decrease was observed in Khan supports the conclusion of Dr. Sarrazin [from BOP] that Khan is exaggerating his memory difficulty." *Id.*[6]

Moreover, the Court should bear in mind that Khan committed these offenses while at essentially the same age, and in the same condition, as he is now.  In other words, neither his age nor his condition prevented him from knowingly funding terrorists between 2008-10.  This is not a situation where the defendant, because of age or health, is no longer capable of carrying out his criminal activity.  What he did could be carried out by anyone at any age or condition with access to a phone, a bank account and a reliable list of contacts.

From the start, the defense has tried to paint a picture of Khan as a fundamentally harmless man who is feeble, dependent upon others, and living in a different era.  The recordings show otherwise.  We know from the calls that Khan, far from being a true man of faith, is actually a crude man of anger and a proponent of violence, at least when it comes to Pakistan, jihad, the Taliban and American soldiers overseas.

We also know that Khan was calculating, with a great capacity for detail when it comes to his money.  Numerous calls introduced at trial demonstrate Khan's command of detail when discussing his bank accounts or how money would be divvied up among his Taliban associates and the intermediaries he used to get the money to them (*see, e.g.*, GX26,31,70,68,71,73,10,12,15,17,125,128,36,32,39).  Khan also frequently discussed manipulating facts or making false claims in order to benefit himself.  To take just one example, in October 2009, in the very same call in which he called for suicide attacks to be conducted "at the government places" and cursed Pakistan's leaders, Khan approved of falsely over-stating the

---

6    Of course, even Khan's initial score was doubtful, given that it was offered to excuse him from taking the English language and history portions of the US naturalization exam, and there is no other medical report in existence documenting any mental health issues with Khan between 1999 and July 2012.

26

volume of crops grown on his land in Pakistan so he could collect more money as compensation from the Pakistani government – the one he wanted destroyed.  GX54 at 4-5.  When it comes to money, or the Taliban, Khan knows perfectly well what he is doing and how to arrange it.

Khan may argue for leniency based upon his support for the madrassa, which he suggested at trial provided assistance and education to neglected children in Swat.  But again, the Court should bear in mind that this same madrassa (1) hosted the Taliban preacher Motabar Khan (GX66,124), (2) was a place where the Taliban slept (GX125); (3) was shut down in 2009 and not allowed to re-open immediately by the Pakistan government due to suspected terrorist links (GX62), and (4) by Khan's own admission to the source, funneled children to the mountains to train with Fazlullah and learn to kill Americans in Afghanistan (GX118).  As Khan put it in a recording on August 28, 2010, "[i]n the past, they had a proper program before; they used to go . . . From our mosque and other mosques too . . . they used to go surreptitiously [to] maulvi Fazlullah . . . They were fighting Americans."  *Id.* at 29-30.

Khan may also argue that he is entitled to leniency because he has no prior criminal history.  While that is true, in this case the jury found that Khan's terrorist support spanned three years; it was not an isolated act.  Moreover, in the terrorism context, the lack of prior criminal history is a less compelling reason for a sentence reduction.  See *Meskini*, 319 F.3d at 92; *United States v. Ressam*, 679 F.3d 1069, 1098 (9th Cir. 2012) (*en banc*) (concurring op.) ("[A] significant factor in determining the appropriate length of a sentence for those committing criminal offenses is ordinarily their past criminal history. What is a reasonable sentence for a first time offender will often be unreasonable for a defendant with a lengthy criminal record, and vice-versa. This is surely not the case with a foreign enemy terrorist. His previous criminal

record is wholly irrelevant.").

Khan may also argue that he is entitled to leniency because of his conditions of confinement, now and in the future, with BOP.  Where Khan may ultimately be assigned by BOP after sentencing is unclear, and may depend in part upon his medical needs, so speculation about his future confinement conditions is inappropriate.  As for the challenges of his pretrial confinement in the SHU (necessitated by the nature of the terrorist support charges against him, to be clear), the Eleventh Circuit in *Jayyousi* set firm limits on a district court's consideration of that issue, reversing Padilla's sentence where the Court varied 40% below his Guidelines range largely on this basis.  657 F.3d at 1118-19.

Simply put, Khan's personal history and characteristics do not justify a substantial deviation from his Guidelines range, a range that is consistent with the nature and seriousness of his offenses.

## 2. The need for the sentence imposed -- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Khan's offense was extremely serious.  The money he sent was used by militants who killed for their own political and religious gain.  The charges of which he has been convicted – material support of terrorists – are among the most grave in federal law.  Reducing Khan's sentence inappropriately not only fails to reflect the serious threat posed by terrorist financing, and provide inadequate punishment for that crime, it sends completely the wrong message about respect for our terrorism laws.  Federal terrorism laws stand for the principle that individuals cannot use their own value systems (be they shaped by religion, politics or self-interest) to assist murders, kidnappings and violence overseas.  Khan, in his criminal conduct and in his perjury at trial, willfully disregarded that principle, and the laws of this country, and deserves a just

punishment.  Khan also went further, providing advice to others about how to covertly finance terrorism, lying to well-meaning mosque congregants about the money he collected from them, and using his position as a religious leader to both advance, and conceal, his crimes.

### 3    The need for the sentence imposed -- to afford adequate deterrence to criminal conduct.

This factor also supports a serious sentence.  The Court should impose a sentence significant enough to deter others in this country from financially supporting terrorism.  The Court cannot leave the impression that funding violence overseas only merits a few years in jail, or can be outweighed by a defendant's "good" conduct in other respects.  Equally important, a severe sentence is necessary to prevent people from believing that lying on the witness stand in a federal courtroom carries no additional consequences.  A defendant has a right to testify, but if he does so, he must tell the truth, and not seek to disrupt the trial or provide false evidence.  That applies in any trial, but certainly no less so in the trial of a terrorist financier who was already on record (in recorded conversations) as saying he would lie to support his goal.

### 4    The need for the sentence imposed -- to protect the public from further crimes of the defendant.

Khan will likely claim that he is an old, sick man and that he poses no future danger to anyone.  But Khan began this scheme, according to the indictment, in 2008, when he was already 73.  Neither age nor health prevented Khan from sending thousands of dollars to militants over the past few years; only pre-trial detention did that.  As we have argued, all Khan has needed for these crimes is a phone, his bank account and his list of family members and Taliban-friendly contacts.  For however long Khan has access to those items, he will remain a threat to support terrorism financially.  Nothing about his advancing age prevents Khan from committing these crimes starting in 2008, or lessened his zeal – reflected in the recordings – for violence.

Moreover, the Eleventh Circuit has suggested that the reduced likelihood of recidivism due to a defendant's age is not a proper consideration in terrorism cases.   In *Jayyousi*, the court wrote: "Although recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders. We also reject this reasoning here. '[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" 657 F.3d at 1117 (citations omitted).  This factor favors a serious sentence.

**5    The need for the sentence imposed -- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

This factor does not meaningfully affect the analysis, in our view.  Although Khan needs medical care, the nature of that care does not dictate how long or short his sentence should be. By its language, this factor does not ask whether the defendant would receive better medical care outside; it asks whether the sentence must be relatively longer or shorter in order to provide a specific necessary treatment.  That said, the level of Khan's medical care in BOP will be equal or greater to what he would receive living outside, and likely at no greater expense to the public than if he were on his own, given his finances and other matters.[7]  There is no evidence that any of Khan's legitimate conditions cannot be monitored or treated effectively while incarcerated for an appropriate term.

**6        The kinds of sentences available**

This factor likewise does not affect the analysis.  There can be no serious argument for any sentence other than imprisonment for this defendant, convicted of four material support to

---

[7]      The Court will recall that in the recordings Khan discussed committing Medicare fraud.  *See* Government's 404(b) Notice.

terrorism charges.  Any other sentence would be unprecedented.

### 7 The advisory Guidelines range

As the Supreme Court wrote two months ago, the Guidelines are still "the lodestone of sentencing" and district courts "'must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.'" *Peugh v. United States*, 133 S. Ct. 2072, 2084 (2013).  The Guidelines generally can be assumed to be a "rough approximation" of a sentence that would "achieve §3553(a)'s objectives." *Rita v. United States*, 127 S. Ct. 2456, 2458 (2007).  That is no less true in terrorism cases. *See Jayyousi*, 657 F.3d at 1119.

Khan's Guidelines range is life imprisonment, capped at 720 months.  Whatever Khan's remaining lifespan may be, any sentence below 15 years would represent an enormous variance from that figure.

### 8 Pertinent policy statements in the Guidelines

There are no policy statements in the Guidelines that justify a substantial variance for Khan. If anything, they cut against undue leniency.  Although the Guidelines Policy Statement on Age (USSG 5H1.1) states that age may be relevant in "unusual" cases, the Eleventh Circuit has held that "generally an offender's age and health are not relevant." *Irey*, 612 F.3d at 1183. The Guidelines also say, as a matter of policy, that there are limits to a sentencing court's consideration of a defendant's prior good deeds.  USSG 5H1.11 ("Civic, charitable . . . and similar prior good works are not ordinarily relevant in determining whether a departure is warranted").  In addition, as a policy matter, "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." USSG 5H1.6.  This language is particularly pertinent to Khan, given his claim that he only sent money to Pakistan to fulfill his

responsibilities to family members there, and also that his family will be burdened if he is incarcerated.

**9        Avoiding disparity with similar defendants**

Section 3553(a)(6) directs the court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A 15-year sentence is well within range of sentences imposed on terrorist financiers like Khan, even those with no prior criminal history. Certainly sentencing Khan to 15 years does not create a disparity with similarly-situated defendants; sentencing him meaningfully below that figure would create such a disparity, however.

The starting point for this prong of §3553 is defining what defendants are similarly situated to Khan; apples to apples, not oranges. *See Jayyousi*, 657 F.3d at 1117 ("in considering 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,' 18 U.S.C. §3553(a)(6), the district court unreasonably failed to consider the significant distinctions between Padilla's circumstances and the sentences of other offenders the district court referenced at the sentencing hearing"); *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (defendants who plead guilty are not similarly situated to offenders who go to trial).

Khan has been convicted of four serious terrorism charges, under §§2339A and 2339B. He went to trial rather than accepting responsibility. He has no prior criminal history. He provided financial support for terrorism rather than participating firsthand in violence. And he played a leadership role in the scheme. These are the salient facts in comparing Khan to others with "similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6).

With those criteria in mind, most defendants in Khan's situation have received approximately 15 years, or more, imprisonment.  For example:

- In the recent Holy Land terror financing prosecution, the defendants, residents of the United States, were convicted after trial of violating §2339B for fundraising for Hamas.  The jury found that the defendants had used the Holy Land Foundation, ostensibly a charity to distribute zakat donations, as a means to get money to terrorists in the Middle East.  The district court applied the terrorism enhancement and imposed sentences ranging from 65 years in prison for the organizers of the scheme to 15 years for the most minimal participants.  The Fifth Circuit affirmed.  *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011).  Notably, none of the defendants in that case had a criminal history, and none engaged in, or plotted, violence themselves.

- In *United States v. Awan*, 607 F.3d 306 (2nd Cir. 2010), the defendant, a U.S. resident, funneled money to an Indian terrorist group, and was convicted after trial of violating §2339A and committing other crimes.  The district court initially failed to apply the terrorism enhancement, stating that Awan did not have a "motive" to support terrorism.  The Second Circuit reversed, finding that the district court's analysis of the terror enhancement was wrong because the inquiry is not about motive.  On remand, Awan received 14 years' imprisonment.

- In *United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004), the defendant, a U.S. resident, was convicted after trial of violating §2339B and other statutes based upon his financial assistance to Hezbollah.  Despite the fact that the defendant's out-of-pocket donations to Hezbollah totaled only $3500, *id.* at 326, the Fourth Circuit upheld the terrorism enhancement and approved a 30 year (360 month) sentence.  483 Fed. Appx. 865 (4th Cir. 2012).

- In this district, the closest counterpart to Khan may be Adham Hassoun, one of the defendants convicted after trial in the Padilla case.  Hassoun was a terrorist financier who like Khan provided money, advice and contacts in support of violent jihad overseas.  Hassoun was convicted of violating §2339A, among other statutes, and despite having no prior criminal history, received the terrorism enhancement and was sentenced to 188 months (15 2/3 years).

- Another counterpart from this District, at least in terms of leadership role in the offense, is Narseal Batiste, the organizer of the Liberty City Seven group.  *United States v. Augustin*, 661 F.3d 1105 (11th Cir. 2012).  That case, a sting, is markedly different in its facts.  But Batiste, like Khan, was convicted after trial of violating §§2339A and B, and received both the terrorism enhancement and a role enhancement based upon the direction and control he exercised over others.  In those regards, Batiste is like Khan.  Batiste received 162 months (13 ½ years)

imprisonment.

For context, many §§ 2339A or B convictions have resulted in far higher sentences than we seek here for Khan.  For instance, in *United States v. Abu Ali*, the Fourth Circuit reversed the district court's decision to sentence the defendant to 360 months, rather than life, for violating those statutes.  528 F.3d 210, 258 (4th Cir. 2008).  The court found that "[b]ased on the [] circumstances of this case, we find the district court's significant downward deviation not to be justified."  *Id.* at 269.  In *United States v. Mustafa*, the Second Circuit upheld a sentence of life imprisonment for violating §§2339A and B, among other statutes.  406 Fed. Appx. 526, 528 (2nd Cir. 2011).  In the "Millennium Bomber" case, the Ninth Circuit reversed the district court's 264–month sentence of defendant Ressam for violating §2339B, finding that the sentence was too light.  *Ressam*, 679 F.3d at 1071–72 ("Upon our review of the record, we conclude that the district court abused its discretion in sentencing Ressam as it did. As a result, we conclude that the sentence imposed by the district court was substantively unreasonable.").  And in *Jayyousi*, the Eleventh Circuit reversed Jose Padilla's 208-month sentence for his convictions under §§2339A and 956 convictions as too low.  657 F.3d at 1119.  Those cases involved more targeted plots for violence and thus are not apples-to-apples comparisons for Khan, but we highlight them to point out that 15 years is, if anything, a moderate punishment in the run of §§2339A and B convictions.

## Conclusion

For all of the foregoing reasons, the Court should (1) adopt the PSI including its

34

calculation of Khan's advisory Guidelines range, (2) deny Khan's objections to the PSI, and  (3)

after considering the factors in 18 U.S.C. §3553, impose upon Khan a sentence of at least 15

years imprisonment.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:    /s/ John C. Shipley
       John C. Shipley
       Assistant United States Attorney
       FL Bar No. 0069670
       Sivashree Sundaram
       Assistant United States Attorney
       District Court No. A5501212
       Michael Patrick Sullivan
       Senior Litigation Counsel
       FL Bar No. 0134814
       United States Attorney's Office
       99 N.E. 4th Street, Suite 800
       Miami, Florida 33132-2111
       Telephone Number (305) 961-9000
       Fax Number (305) 536-3675
       John.Shipley@usdoj.gov
       Sivashree.Sundaram2@usdoj.gov
       Pat.Sullivan@usdoj.gov

       Bridget Behling
       Trial Attorney
       Counterterrorism Section,
       National Security Division
       United States Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2013, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF for electronic delivery to all counsel of record.

/s/ John Shipley

Assistant United States Attorney